UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

---

In re

BRIAN A. MOREY and
PATSY M. MOREY,

        Debtors.

Case No. 09-26318

Chapter 13

---

MEMORANDUM DECISION ON GMAC, LLC'S OBJECTION TO CONFIRMATION

---

This matter came before the Court on GMAC, LLC's objection to confirmation of the debtors' chapter 13 plan. This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L). Pursuant to Fed. R. Civ. P. 52, made applicable to this proceeding by Fed. R. Bankr. P. 7052, this decision constitutes the Court's findings of fact and conclusions of law.

BACKGROUND

The material facts are not in dispute. On March 3, 2007, the debtors purchased a new 2006 Chevrolet Uplander truck for their personal use for $28,299.75. They traded in a 2004 Chevrolet Tahoe Truck worth $24,000, with a balanced owed of $29,144.60. The new loan, which included the $5,144.60 deficiency for the trade-in, was financed through the dealer, Bergstrom Chevrolet. The total sum of $34,211.85, which included fees and gap protection, was financed on the date of purchase at an interest rate 6.90% per annum. This retail installment sale contract was then assigned to GMAC.

The debtors filed for chapter 13 bankruptcy relief on May 4, 2009. The petition was filed within 910 days of the subject vehicle purchase. GMAC filed a proof of claim in the amount of

$25,894.94, as a secured claim. GMAC also objected to the debtors' plan which separated its claim into the purchase price of the vehicle and the negative equity from the trade-in vehicle's loan. Because the balance due on the loan at the petition date was $26,546.00, and the purchase price of the Uplander was 82.72% of the loan, the debtors classified $21,958.62 as fully secured at the contract rate. The remainder was included in the debtors' general unsecured debts.

ARGUMENTS

GMAC argues the text, legislative history, and congressional intent all compel the conclusion that the hanging paragraph in 11 U.S.C. § 1325(a) applies to secured claims that include negative equity with respect to a trade-in vehicle. The text plainly prohibits the bifurcation of any claim coming within its scope and it contains no limiting language. Additionally, an amount financed under a retail installment sale contract including payoff of negative equity clearly qualifies as a purchase money obligation because the negative equity obligation is an integral part of the purchase money package that is a motor vehicle retail installment sale. The debtors acquired their vehicle in a single installment sale transaction evidenced by a single retail installment sale contract, securing a single asset. But for the installment sale purchase of the Uplander there would have been neither a trade-in of the Tahoe nor the financing of the negative equity associated with it.

The debtors assert this Court should adopt the "dual status" analysis whereby the negative equity is not included in the subject purchase money security interest. Various courts have concluded that the funds loaned to satisfy the negative equity are not a component of the purchase price of the collateral or the value given to enable the debtor to acquire rights in the collateral. A "purchase money obligation" is defined by state law as an "obligation of an obligor

2

incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." Wis. Stat. § 409.103(1). The requirement that the value be "in fact so used" to acquire the collateral means that a purchase money security interest is not used to pay off an antecedent debt.

## DISCUSSION

Upside-down car loans have always been commonplace. Sellers and lenders frequently provide financing for the full purchase price of a car, but the car depreciates in value practically as soon as it leaves the dealer's lot. Many payments must be made before the value of the car exceeds the remaining amount of the loan, and debtors frequently have to file a bankruptcy case before that happens.

Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), such undersecured loans were bifurcated into secured and unsecured claims under 11 U.S.C. § 506(a) and a chapter 13 debtor was allowed to cram down the loan amount to the value of the car under 11 U.S.C. § 1325(a). Thus, the lender was secured only to the extent of the value of the collateral. Any remaining amount on the loan was classified and paid as unsecured.

BAPCPA changed this result by enacting what is known as the "hanging paragraph," which states:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

11 U.S.C. § 1325(a). The hanging paragraph clearly provides if a creditor has a purchase money security interest in a motor vehicle that was acquired for personal use within the 910-day period preceding bankruptcy, then for purposes of section 1325(a)(5)'s cramdown provision, the debtor may not use section 506 to bifurcate the creditor's claim into secured and unsecured components.

Treatment of the claim is straightforward if the debtor has not used a trade-in as part of the purchase, or if the trade-in was not subject to a loan in excess of its value. Whatever is unpaid as of the date of filing is a secured claim, notwithstanding the actual value of the vehicle. The controversy arises when, as happened with the Moreys, the debtor purchases a car with a trade-in that is not yet paid for and is worth less than the amount outstanding, a characteristic that has come to be known as "negative equity." Courts have grappled with whether or not, when negative equity on a used automobile trade-in is included in the financing of a new car purchase, the resulting security interest qualifies as a purchase money security interest for purposes of section 1325(a).

Several courts have taken the position that the negative equity resulting from a trade-in of a vehicle is not part of the purchase money security interest, and is, thus, not subject to the 910-day rule imposed by the hanging paragraph in section 1325(a). *See, e.g., In re Penrod*, 392 B.R. 835 (B.A.P. 9th Cir. 2008); *In re Callicott*, 396 B.R. 506 (E.D. Mo. 2008); *In re Crawford*, 397 B.R. 461 (Bankr. E.D. Wis. 2008); *In re Hernandez*, 388 B.R. 883 (Bankr. C.D. Ill. 2008).

On the other hand, many courts have taken the view that the financing of negative equity is part of the purchase money security interest. *See In re Ford*, __ F.3d __, 2009 WL 2358365 (10th Cir. Aug. 3, 2009); *In re Price*, 562 F.3d 618 (4th Cir. 2009); *In re Graupner*, 537 F.3d 1295 (11th Cir. 2008); *In re Padgett*, 408 B.R. 374 (B.A.P. 10th Cir. 2009); *In re Knepper*, 405 B.R.

568 (Bankr. W.D. Pa. 2009); *Matter of Peaslee*, __ N.E.2d __, 2009 WL 1766000 (N.Y. June 24, 2009).

Not surprisingly, given the lack of unambiguous guidance from the statute, the courts in this district are split with respect to the purchase money status of negative equity. *See In re Crawford*, 397 B.R. 461 (Bankr. E.D. Wis. 2008) (Judge Kelley holding creditor did not have purchase money security in funds advanced for trade-in vehicle); *In re Dunlap*, 383 B.R. 113 (Bankr. E.D. Wis. 2008) (Judge Shapiro finding creditor's claim was protected against cram down); *Cf. In re Smith*, 401 B.R. 343 (Bankr. S.D. Ill. 2008) (Judge Pepper applying Illinois law to find creditor had purchase money security interest for entire amount financed). As uncertainty must be tested in every court within a district before counsel will know where they stand with respect to an issue, I am the last in this district to decide it.

Judge Shapiro concluded that under Wisconsin law, the use of negative equity financing by the debtors and lender in connection with the purchase of a new car did not destroy the purchase money nature of the lender's security interest. *In re Dunlap*, 383 B.R. 113 (Bankr. E.D. Wis. 2008). He found that Official Comment 3 to section 9-103 of the Uniform Commercial Code supported such conclusion, providing that "[t]he concept of 'purchase money security interest' requires a close nexus between the acquisition of the collateral and the secured obligation." The financing of the negative equity in the trade-in and the financing of the new vehicle were part of the same transaction and came as a package deal. Payment of the trade-in debt, and thus financing of the negative equity, was a prerequisite to consummating the sales transaction, and utilizing the negative equity financing accomplished the goal of purchase and sale of the vehicle. *Id*. at 118. Wisconsin law defines a "purchase money obligation" as one

5

"incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral." Wis. Stat. § 409.103(1)(b). In *Dunlap*, the payment of the balance due on the debtors' trade-in vehicle was a prerequisite to consummating the transaction. There was thus a close nexus between the debtors' acquisition of the new car and the entire secured obligation, including the negative equity portion. Moreover, the court noted that nothing in BAPCPA declared that negative equity financing barred a secured lender from protection under the hanging paragraph; to the contrary, one of BAPCPA's goals "was to afford additional protection for secured creditors, and primarily, for automobile lenders." *Id*.

Likewise, while sitting in the Southern District of Illinois, another of this Court's colleagues, Judge Pepper, concluded the lender had a purchase money security interest for the entire amount financed, including the sums advanced to allow the debtor to purchase a service contract and gap insurance, as well as to enable the debtor to pay off the negative equity in her trade-in vehicle. *In re Smith*, 401 B.R. 343 (Bankr. S.D. Ill. 2008). In that case, the court looked to the definition of "cash sale price" in the Illinois Motor Vehicle Retail Installment Sales Act as bearing on the issue of whether the sums that the lender had advanced to pay off the debtor's negative equity in her trade-in vehicle was part of the "price" of its collateral under the Illinois Uniform Commercial Code, such that the lender had the required "purchase money security interest" for the entire amount purchased. The court conclude that the Illinois UCC and MVRISA related to similar subjects and were *in pari materia*. Thus, all of the financing advanced was part of the "price" of the new motor vehicle, and was "value given to enable the debtor to acquire rights in" the vehicle, and the mere fact that the lender advanced sums for a service contract, gap insurance, and to pay off the negative equity did not destroy or limit the

protection accorded to the lender by the "hanging paragraph." *Id*. at 352.

In a contrary holding, Judge Kelley concluded that the chapter 13 debtor's obligation to pay off her negative equity in a trade-in was in the nature of an "antecedent debt," for which the creditor that advanced funds to enable the debtor to complete the purchase transaction. Thus, this portion of the loan could not have a "purchase money security interest." *In re Crawford*, 397 B.R. 461 (Bankr. E.D. Wis. 2008). Under Wisconsin law, a purchase money security interest cannot secure any antecedent debt. Therefore the lender was not protected by the "hanging paragraph" from having its claim bifurcated. Crawford rejected the *in pari materia* approach, stating:

> The divergent purposes of the purchase money security interest provisions of the UCC (to provide priority for those creditors financing the debtor's purchase of assets) and the Wisconsin Consumer Act (regulation of finance charges and disclosure of all charges incurred by the consumer in the financing transaction) militate against reading these statutes together to make negative equity – an antecedent debt – a component of a purchase money security interest.

*Id*. at 467.

As all of these courts, both within this district and around the country, have discussed, application of the hanging paragraph depends on the creditor having a purchase money security interest. Since bankruptcy law does not define that term, the courts look to other law, namely, Article 9 of the Uniform Commercial Code,[1] as that law has been enacted and developed in each

---

[1] Section 9-103(f) of the Uniform Commercial Code mandates the dual status approach for transactions *other* than consumer goods transactions, but the hanging paragraph applies only to consumer goods transactions. Section 9-103(h) makes it clear that in consumer goods transactions, the court is free to choose either the dual status approach or the transformation approach, which was developed under pre-revision Article 9. Under the transformation approach, combined purchase money and nonpurchase money obligations creates an obligation that is entirely nonpurchase money in nature. Neither GMAC nor the debtors are advocating for the application of the transformation rule, although at least one court has so found. *See, e.g., In*

7

state.  Under Article 9, a security interest is a purchase money security interest if the secured obligation was "incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used."  U.C.C. § 9-103(a)(2); Wis. Stat. § 409.103(1)(b).

GMAC submits that *Crawford's* characterization of the negative equity as "antecedent debt" is a conclusory assertion that cannot withstand scrutiny.  Arguably, the negative equity obligation is not an antecedent debt because the trade-in payoff amount was not owed to the dealer, the creditor under the retail installment sale contract who gave present consideration for the negative equity obligation by making the trade-in payoff advance as part of its motor vehicle installment sale transaction with the debtors.  As noted by another court:

> The amount [the debtor] financed to pay off the negative equity on his trade-in vehicle involved a new, smaller amount, a new lender, a new piece of collateral, and a new contract.  In short, it was not "antecedent debt."  The negative equity was part of the bargained-for total cash price of the new vehicle [the debtor] financed with [the dealer], as well as the value [the dealer] gave to enable [the debtor] to gain rights to and enjoy use of the collateral.  A closer nexus to the collateral can hardly be imagined.

*In re Muldrew*, 396 B.R. 915, 926 (E.D. Mich. 2008).

GMAC further argues the *Crawford* decision improperly focused on the requirement that value given to enable the acquisition must be "in fact so used," but failed to recognize that this requirement addresses only a purchase money loan proceeds tracing scenario in which a third party advances money to the buyer, which the buyer then uses to pay the seller.  In this case, the party advancing the loan was the seller, so there was no concern that the advance was made for the purpose of enabling the debtor to acquire the collateral and that it was "in fact so used."

---

*re Blakeslee*, 377 B.R. 724 (Bankr. M.D. Fla. 2007).

8

Furthermore, the Wisconsin Consumer Act authorizes motor vehicle dealers, in their capacity as retail installment sellers, to include debt attributable to negative equity in the amount financed portion of the purchase money package. Wis. Stat. § 421.301(5)(b). Although the Act excludes transactions in which the amount financed exceeds $25,000 – such as this case – GMAC argues it is still relevant under the *in pari materia* doctrine because it represents a legislative determination that debt attributable to negative equity bears a close nexus to the acquisition of a motor vehicle. In contrast, the *Crawford* court concluded that "[t]he Wisconsin Consumer Act and the UCC should not be read *in pari materia* because of their vastly different purposes." *Crawford*, 397 B.R. at 466.

As noted by one bankruptcy court, neither the transformation rule nor the dual status rule should be applied because both rules are typically invoked when lenders refinance old collateral and add new collateral. *In re Weiser*, 381 B.R. 263, 270 (Bankr. W. D. Mo. 2007). In such instances, the value given by the creditor for the new item has nothing to do with enabling the debtor to acquire rights in or the use of the prior items. Since the entire debt is rolled into a new obligation, that new obligation does not represent value given "to enable the debtor to acquire rights in" the items that such debtor already owns. The dual status and transformation rules assist courts with the difficult task of parsing out what part of the remaining obligation constitutes value given to enable the borrower to acquire each item. Such is not the situation in the negative equity context because only the new car secures the obligation; the obligation on the old car is extinguished. Likewise, since the new lender provides the funds to pay off the prior lender, the "value given to enable the debtor to acquire rights in" the new car is readily apparent. *Id*.

Notable decisions at the circuit level on the issue have recently been rendered. The

Eleventh Circuit held that negative equity was part of the purchase money obligation in *In re Graupner*, 537 F.3d 1295 (11th Cir. 2008). The court relied in part on the Official Comment to section 9-103 which states there is a sufficiently close nexus between "sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations" to justify giving them purchase money status. The Eleventh Circuit determined the nexus between negative equity and the acquisition of the new car justified the same result, emphasizing the fact that the list in the comment is not exclusive and includes items, such as attorney's fees, that do not have to be paid to drive a new car off the lot. *Id*. at 1302. The court further relied on the fact that the Georgia Motor Vehicle Sales Finance Act defined "cash sale price" to include negative equity and held that section 9-103 of the UCC and the state provision and had to be read *in pari materia*. The court also concluded that giving secured parties the full benefit of the hanging paragraph was consistent with the policies that led Congress to enact the provision. *Id*.

Like the Eleventh Circuit, the Fourth Circuit held that debtors were precluded from bifurcating the debt into secured and unsecured portions and cramming it down through a plan. *In re Price*, 562 F.3d 618 (4th Cir. 2009). The court determined that negative equity financing was an integral part of a debtor's purchase of a new car:

> [T]he value given by [the seller] to pay off the [debtors'] negative equity "enabled" the [debtors] to acquire the new vehicle. That is because the negative equity financing was integral to the whole transaction in which the new vehicle was purchased. All of the [debtors'] debt to [the creditor] was incurred at the same time, in the same contract, and for the same purpose: acquiring the new car. In other words, the negative equity financing enabled the purchase of the new car because the negative equity financing and the purchase were a "package deal."

*Id*. at 625 (citing *Graupner*, 537 F.3d at 1302). Such result also effectuated Congressional intent

10

in enacting the hanging paragraph: to protect secured car lenders from having their claims bifurcated. *Id*. at 628.

The Second Circuit declined to decide the issue and instead certified the question to the New York Court of Appeals. *In re Peaslee*, 547 F.3d 177 (2$^d$ Cir. 2008). The New York appellate court concluded purchase money security interests included negative equity from trade-in vehicles. *Matter of Peaslee*, __ N.E.2d __, 2009 WL 1766000 (N.Y. June 24, 2009).

The Tenth Circuit recently rendered a similar ruling in *In re Ford*, __ F.3d __, 2009 WL 2358365 (10th Cir. Aug. 3, 2009). The court noted that while it was theoretically possible to split the exchange of vehicles into two separate transactions, that was not how the parties treated the deal. They signed a single agreement encompassing the trade-in of the old vehicle and the sale of the new vehicle, making the exchange essentially a single transaction. The expense incurred in retiring the lien on the trade-in vehicle was thus an expense incurred in connection with acquiring rights in the new car, making the new vehicle purchase money collateral for the entire obligation. *Id*. at *4. The dissent focused on an analysis of the Kansas version of the Uniform Commercial Code, which has developed the dual status rule with respect to negative equity financing.

As the above cases so clearly demonstrate, the interpretation of the hanging paragraph in the context of financing negative equity on a trade-in can result – and after rigorous intellectual analysis and scrutiny of applicable law has resulted – in at least three different outcomes: entirely PMSI, dual status, or transformation. I am persuaded that GMAC's interpretation is the correct one, and the payoff of the trade-in is an integral part of a single transaction, satisfying the close nexus requirement, and that payoff allows the debtor to acquire rights in the collateral. The trade of the old vehicle, which had to have the lien released to allow the dealer to sell it, made the

Case 09-26318-mdm    Doc 43    Filed 09/09/09    Page 11 of 13

purchase of the new vehicle possible. Without rolling the two debts together, there is probably no way for the debtor to make payments on the old car, plus payments on the new car. Besides, the debtor does not need both the old and new cars. The debtor could not sell the old car to a third party without paying it off, and paying it off without additional financing is unlikely. The debtor would have to find unsecured debt to do so. Result: no sale and disappointment all around. The parties had resolved to do a deal whereby at the end of the day, the debtors would have a new Uplander, the dealer would have an old Tahoe without a lien, and the debtors would owe the dealer about $34,000. The loan, purchase price, and value assigned to the trade-in could be adjusted (manipulated) to make it happen because it was actually only one transaction between the same two parties. Another way might have been for the dealer to jack up the price for the Uplander and use that excess profit to pay off the Tahoe it took in trade. There may be unacceptable tax consequences for that scenario relating to the dealer's income taxes and the buyer's sales tax, which would diminish the popularity of this structure, but the financing would definitely be entirely purchase money. Savvy business people can probably devise other models.

Those who hold to the dual purpose rule of the obligation are, of course, correct about the exact nature of the transaction. The debtor is paying off an old loan on the old car plus a new loan on a new car; it is just rolled into the new financing. Nevertheless, setting up the transaction as the Moreys and so many other car buyers and sellers do it *does* enable the buyer to obtain rights in the collateral. It is not the only way to buy a new car and finance it, but it is probably the only way buyers like the Moreys can do it. While I acknowledge the discussion in *Crawford* concerning the different purposes of the Wisconsin Consumer Act and the Wisconsin provisions of the Uniform Commercial Code is right in most circumstances, it seems to me that in the

context they are presented with here, they can be considered together and read *in para materia*. The consumer act provides for the inclusion of negative equity in the purchase money security interest, and the commercial code could go either way, provided we concentrate on its words. Current and historical comments are helpful but not necessarily determinative in the bankruptcy context, which was not clearly contemplated by the comments. I cannot discern a good policy reason to treat obligations securing individuals' personal vehicles differently for bankruptcy purposes based on whether they are less than or exceed $25,000, since a substantial portion of new automobiles have sale prices over $25,000. Many, possibly most, car buyers are not sophisticated in commercial transactions and are not acting in a commercial context as the UCC assumes. I am satisfied Congress intended to protect vehicle loans from cramdown by this provision.

     Accordingly, the entire amount of the debt securing the Moreys' Uplander meets the definition of purchase money security interest as that term is used in 11 U.S.C. § 1325(a), and GMAC's objection to confirmation is sustained.

     The debtors shall have 30 days to file an amended plan consistent with this decision.

September 9, 2009

                                  Margaret Dee McGarity
                                  Chief Judge, U.S. Bankruptcy Court